# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| **CITY OF HUNTSVILLE,** ) | |
| **d/b/a HUNTSVILLE UTILITIES,** ) | |
|     **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.: CV-02-VEH-1296** |
| ) | |
| **PROLIANCE ENERGY,** ) | |
| **LLC; HARRY BUSH; and** ) | |
| **BRIANE HOUSE,** ) | |
| ) | |
|     **Defendants.** ) | |

## MEMORANDUM OF DECISION

This diversity action arising out of a natural gas management and agency agreement between the Plaintiff, City of Huntsville d/b/a Huntsville Utilities ("Huntsville") and the Defendants, ProLiance Energy, LLC ("ProLiance") and two ProLiance employees, Harry Bush and Briane House, was tried to a jury from January 24, 2005 until February 10, 2005. The jury's verdict was as follows.

Huntsville's Claims

| Count | Claim | Verdict |
|---|---|---|
| One, Two | RICO | For Huntsville; against ProLiance and Harry Bush |
| Four | Breach of contract | For Huntsville; against ProLiance |

| | | |
|---|---|---|
| Five | Breach of Fiduciary Duty | For Huntsville; against ProLiance |
| Six | Fraudulent Inducement | For Huntsville; against ProLiance and Harry Bush |
| Seven | Fraud | For Huntsville; against ProLiance and Harry Bush |
| Eight | Conspiracy to Defraud | For Huntsville; against ProLiance and Harry Bush |
| Eleven | Conversion | For ProLiance |
| Thirteen | Intentional Interference with Contractual or Business Relations | For Huntsville; against ProLiance and Briane House |

ProLiance's Counterclaims

| Count | Claim | Verdict |
|---|---|---|
| One | Breach of Contract | For Huntsville |
| Six | Breach of Fixed Price Gas Contract | For Huntsville |

Count Four of ProLiance's Counterclaim, Unjust Enrichment, was tried at the same time as the jury trial, and on the same evidence, but judgment on such counterclaim was reserved to the Court. Pursuant to Fed. R. Civ. P. 52, the Court now finds the facts specially and states separately its conclusions of law thereon, making all necessary determinations of credibility of witnesses where trial testimony conflicted.

Findings of Fact

Based upon the evidence presented at trial, the Court makes the following findings of fact.

ProLiance is a natural gas marketing company. Huntsville Utilities is a municipal utility established by municipal ordinance of the City of Huntsville, Alabama. This dispute arises from a contractual and business relationship between Huntsville and ProLiance for the purchase, sale, management, and delivery of natural gas from 2000 through 2002.

Huntsville is divided into three departments: gas, water, and electric. A three-member board selected by the City Council of Huntsville, Alabama oversees each department. During much of the time period relevant to this lawsuit, the manager of Huntsville's gas department was John DeMent ("DeMent"). DeMent began working for the gas department in 1958, became the gas department manager in 1984, and was the manager until the Spring of 2002. When DeMent was the gas department manager during times relevant to this lawsuit, his supervisors were Bill Pippin, the general manager of Huntsville, and Henry O'Quinn, the assistant general manager.

Previously, when the federal government more heavily regulated the natural gas industry, local gas utilities like Huntsville contracted with interstate pipelines to secure the transportation and storage services and gas supply they needed to serve

their customers. As the federal government reduced its regulation of the natural gas industry, many local gas utilities like Huntsville began contracting with companies known as "gas marketers" to secure gas supply and many of the transportation and storage services they previously obtained from the interstate pipelines.

Since the early 1990's, Huntsville has contracted with several gas marketers. The first was a company called CC Pace. The CC Pace customer representative that dealt with Huntsville was Harry Bush ("Bush"). CC Pace subsequently became Brooklyn Union, Brooklyn Union subsequently became Penn Union, and Penn Union later became Columbia Energy. Throughout, Bush continued as Huntsville's customer representative. In 1999, Columbia Energy was acquired by Enron, and Enron became the gas marketer for Huntsville. Bush was not employed with Enron.

For a number of years, Huntsville was a member of a group of municipal gas utilities known as the Tennessee Valley Supply Group ("TVSG"). Other TVSG members included the gas utilities of the cities of Decatur, Cherokee, Sheffield, and Russellville, Alabama. The members of TVSG collectively negotiated contracts with gas marketers.

In April, 2000, TVSG invited various gas marketers to submit proposals for contracts with the member utilities to take effect when their current contracts (with Enron) expired. Huntsville's contract with Enron was to expire September 30, 2000.

ProLiance Energy LLC is a gas marketer with its principal place of business in Indianapolis, Indiana. Bush became employed with ProLiance in August, 1999. ProLiance was one of several gas marketers that submitted proposals in response to the April, 2000, TVSG invitation

As part of ProLiance's proposal, Bush told Huntsville that, if a project called the Sipsey River Project went through, ProLiance would give Huntsville a credit on its gas purchases, that the credit would be worth as much as $717,300, and that Huntsville could use that credit to apply to its gas purchases from ProLiance to reduce the price of gas purchased from ProLiance to $2.26 per unit. At the time that Bush made these statements, he knew that the Sipsey River Project was not going to occur. Based on Bush's statements, Huntsville believed that the Sipsey River Project, and therefore the $717,300 credit, was viable. At the time, Huntsville had been paying $2.16 per unit. Prices were rising, but DeMent believed the Sipsey River credit would allow Bush to obtain gas for the winter season at $2.26 per unit.

On September 15, 2000, in reliance on Bush's statements which intentionally and falsely implied that the Sipsey River Project was viable, Huntsville entered into a Natural Gas Management and Agency Agreement with ProLiance ("the Agreement"). The Agreement provided that Huntsville could purchase gas at either an index minus a discount price, or at a fixed price. Huntsville did not fix the price

5

for gas until March 1, 2001[1]. ProLiance never advised Huntsville to fix the price for gas.

During the term of the Agreement, gas was never available for $2.26 (or less) per unit. Bush repeatedly assured DeMent that he (Bush) was "working on" getting gas at $2.26 a unit. In his previous dealings with Huntsville, Bush had always been able to procure gas for Huntsville at the price Huntsville requested.

In December, 2000, gas prices rose to historic highs.[2] When DeMent received the bill for December's gas purchases, he was shocked. He thought Huntsville would receive gas at $2.26 per unit. Instead, Huntsville was being charged prices in excess of $9.00 per unit. When questioned by DeMent, Bush responded that the Sipsey River project did not go through and there was no $2.26 gas. DeMent told Bush that Huntsville could not afford to pay the December, 2000, bill. He told Bush that ProLiance would have to fix the problem of the high bill. DeMent asked Bush to reduce the December, 2000, bill, but Bush refused. Instead, DeMent and Bush concocted a scheme whereby the bills, beginning with the December, 2000, bill, that Huntsville received and paid showed that gas was being purchased at $2.26 per unit. On the same bills, charges were made up or inflated to increase the amount that

---

[1] Effective date.

[2] Over $9.00 per unit.

Huntsville paid, without showing the actual price it was being charged for gas. Spot market gas purchase prices also were inflated on Huntsville's bills to increase the amount that Huntsville paid. Meanwhile, ProLiance's internal records showed the higher prices that Huntsville was being billed for gas. ProLiance repeatedly used the U.S Mails and facsimile transmissions to send these false invoices to Huntsville.

At Bush's and ProLiance's request, DeMent signed papers purporting to amend the Agreement that created, in effect, a loan from ProLiance to Huntsville.[3] DeMent kept these billing practices, including the "loan", a secret from everyone else at Huntsville. Bush and other ProLiance employees[4] knew that DeMent was keeping these matters secret and not only helped him to keep anyone else at Huntsville from finding out about the true status of Huntsville's account, but actively participated in falsifying information sent to Huntsville. ProLiance kept some of its false charges secret even from DeMent.

This scheme affirmatively misled Huntsville to believe it was purchasing gas at $2.26 per unit. Huntsville was accustomed to fixing the price for its winter gas purchases well in advance of the winter season, and had no reason to question the

---

[3] The Court previously ruled that Mr. DeMent lacked authority to enter into these "amendments". Order (John DeMent's Authority) dated October 4, 2004 (Doc. 174).

[4] Including senior members of management.

$2.26 price. Additionally, $2.26 was the unit price that Huntsville had been told could be obtained by application of the Sipsey River Project credit.

In addition to the false charges and the inflated charges that Huntsville paid, which ProLiance applied to the "loan" balance owed by Huntsville, ProLiance began secretly selling[5] gas that it was supposed to be storing for Huntsville: gas that had been purchased by Huntsville. In late March, 2001, Huntsville decided to sell some of its "storage" gas to help pay for its (higher than anticipated) gas purchase costs. Because it had sold some of Huntsville's gas without Huntsville's knowledge, ProLiance knew there was not enough gas held for Huntsville to comply with the sell directive. ProLiance knew that Huntsville would discover the shortage, and the reason its gas had been sold: the billing scheme. ProLiance told DeMent that either he had to tell Huntsville what had been going on, or Bush would. At this point, DeMent told his superiors about the scheme.

In March, 2001, before the scheme had been discovered, Huntsville elected to "fix" the price of gas at $5.16 per unit for the next twenty-seven months. Huntsville did this because the falsely inflated spot market prices on their invoices[6] were so high.

---

[5] DeMent knew about these sales, but no one else at Huntsville knew. ProLiance sent Huntsville false reports showing that gas was held for Huntsville's account, when that gas had in fact been sold by ProLiance.

[6] Which Huntsville believed were accurate.

After the scheme was discovered, Huntsville tried to find another supplier of gas instead of ProLiance. ProLiance learned of these efforts and, as found by the jury[7], intentionally interfered with prospective business or contractual arrangements between Huntsville and these alternative suppliers. As a result, Huntsville had to purchase gas at higher prices from an alterative source.

The Court finds, as did the jury, that Huntsville was fraudulently induced to enter into the original agreement that ProLiance asserts controls Huntsville's gas purchases for the months of December, 2000, and January, 2001 and further finds that such contract was fraudulently performed by ProLiance.

The Court finds, as did the jury, that ProLiance was guilty of fraud in the performance of the original agreement and that such fraud "lulled" Huntsville into not fixing prices for gas before the prices skyrocketed. The Court finds, as did the jury, that ProLiance violated its fiduciary agency duties to Huntsville in the management of Huntsville's gas purchases and supplies.

## Conclusions of Law

The issue presented for decision by Count Four of ProLiance's Counterclaim is whether, and to what extent, if any, ProLiance is entitled to a monetary sum to

---

[7] And by theCourt.

reimburse ProLiance for gas that Huntsville received but that Huntsville did not fully pay for.  ProLiance alternatively refers to this claim as "unjust enrichment" and "*quantum meruit*."  Huntsville answered ProLiance's counterclaim by alleging, *inter alia*, that ProLiance's claim is barred by the doctrine of unclean hands.

While the Court has to decide Count Four, it notes that Counts One[8] and Four of ProLiance's Counterclaim are interrelated.  In the Pre-Trial Order, discussing the original Agreement, ProLiance asserted that the amount that Huntsville still owed under the original Agreement was $1,467,785.  The original Agreement is the contract that was in force at the time of the December, 2000, and January, 2001, purchases.  As to Count Four, in the Pre-Trial Order, ProLiance claimed that "Huntsville ha[d] been unjustly enriched by receiving and keeping without payment significant quantities of natural gas purchased on behalf of Huntsville by ProLiance."  Now, ProLiance has asked the Court to enter judgment for ProLiance in the amount of $6,490,684 for gas delivered in December, 2000, and January, 2001, gas that was delivered under the orginal Agreement,but allegedly not fully paid for.  This claim is inextricably interwoven with, if not displaced by, the express contract damages claimed in Count One.  Using a different theory does not eliminate the necessity for

---

[8] The jury found for Huntsville and against ProLiance on Count One of the Counterclaim, breach of contract by Huntsville for failure to pay for gas ProLiance says Huntsville received.

identification of damages. ProLiance is limited to the amount set out in the Pre-Trial Order and its counterclaim cannot exceed the amount claimed there: $1,467,785.

The basis for the Count Four claim of $6,490,684 unjust enrichment is ProLiance's analysis of what the jury's verdict "must have meant" regarding damages. In its calculations, ProLiance omits any consideration by the jury of (i) damages flowing from ProLiance's tortious interference (the higher prices Huntsville had to pay to purchase gas from an alternate sources); (ii) damages flowing from Huntsville's failure to fix prices earlier than March 1, 2001; and (iii) damages flowing from ProLiance's breach of its fiduciary duties as Huntsville's agent, any one of which could account for the jury's damages award.[9]

I.  ProLiance's Claim is for Gas Delivered under the Original Agreement and Therefore is Limited to $1,467,785.

As described above, ProLiance's claim under Count Four is for the value of gas delivered to Huntsville in the months of December, 2000, and January, 2001. It is undisputed that gas delivered in those months was delivered under the original (September 15, 2000) Agreement. As stated in the Pre-Trial Order, ProLiance's claim for breach of contract of that Agreement was a claim for $1,467,785 for

---

[9] The jury's verdict is entitled to deference, and the Court is unwilling to second guess the jury's damages calculations, particularly where, as here, there was strong evidence to support the verdict.

11

nonpayment of sums owed for gas delivered in December, 2000, and January, 2001. ProLiance cannot now claim that its damages for nonpayment for those same months is $6,490,684. ProLiance's claim for unjust enrichment is limited to the amount that ProLiance claimed was due under the contract, $1,467,785.

II.  ProLiance's Assertion that Count Four is a Legal Rather than an Equitable Claim is Barred.

At no time prior to the jury verdict did ProLiance assert that its claim in Count Four was a legal, rather than an equitable, claim. ProLiance's failure to assert this legal theory in a timely fashion bars it from post-trial consideration.

Having made a timely jury demand, Huntsville was entitled under the Seventh Amendment to a jury determination of all legal issues. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510-511 (1959). *See also*, Fed. R. Civ. P. 38. Huntsville never agreed to have any legal issue tried by the Court. Huntsville's Motion in Limine (doc. 244) clearly sets forth Huntsville's position that Count Four of the Counteclaim is an equitable claim (see pp. 6-8). ProLiance's Memorandum in Opposition to Plaintiff/s Motion in Limine (doc. 284) never asserted that its unjust enrichment claim (Count Four) should be tried to the jury or that it was a legal claim. Similarly, ProLiance never made either assertion at the January 21, 2005, hearing on Huntsville's Motion.

Furthermore, during the February 8, 2005, hearing on the parties' respective Motions for Judgment as a Matter of Law, Huntsville reiterated several times its position that ProLiance's unjust enrichment claim was an equitable claim. ProLiance never asserted that the claim should be tried to a jury or was a legal claim.

Additionally, pursuant to this Court's Standing Order Establishing Pretrial Procedure at § 9(e), all instructions within the Final Pretrial Order form must be followed and are binding on the parties at trial. The Final Pretrial Order instructed both parties to articulate all legal theories relied upon by that party for any claim of that party. "For each defendant, each plaintiff shall concisely state each legal theory relied upon ...." Final Pretrial Order at § 5(c).

To allow ProLiance to assert that Count Four is a legal, rather than an equitable, claim at this stage would: (i) violate this Court's Standing Order; and (ii) violate Huntsville's right to a trial by jury. *See Simler v. Conner*, 372 U.S. 221, 222, 83 S. Ct. 609 (1963) ("In diversity cases, ... the substantive dimension of the claim asserted finds its source in state law ..., but the characterization of that state-created right as legal or equitable for purposes of whether a right to jury trial is indicated must be made by recourse to federal law [citations omitted].")

Finally, to the extent that ProLiance claims a waiver by the parties of a jury trial on Count Four of the Counterclaim, the Court finds no such waiver. *Cf.* F.R.Civ.

13

P. 39(a) (necessity for written or oral stipulation). Had the Court had any indication that the parties were in fact waiving the jury on Count Four, it would have exercised its discretion under F.R.Civ.P. 39(b) to order the claim be tried by the jury.

ProLiance's attempt to recast its claim as a legal claim for *quantum meruit* is barred.

III.   Even if ProLiance Were Allowed To Recast Count Four as a Legal Claim for *Quantum Meruit*, Its Claim is Barred by the Doctrine of Unclean Hands.

ProLiance cites multiple cases asserting that a claim for *quantum meruit* is a legal, rather than an equitable, claim. However, none of the cases relied upon by ProLiance involved a fact situation where the implied contract under which the party asserting *quantum meruit* sought to recover was a contract which had been fraudulently induced. Both parties rely on *Alabama Trunk & Luggage Co. v. Hauer*, 108 So. 339 (1926)[10]. Additionally, ProLiance relies on *R. D. Burnett Cigar Co. v. Art Wall Paper Co.*, 51 So. 263 (1909) and *I. O. Drewrey Contracting Co. v. Ramsey*, 140 So. 587 (1932). These cases make clear that a party claiming in *quantum meruit* can recover only those benefits that were "voluntarily accepted" *(Hauer* at 340, *Ramsey* at 589) by the other party. As the jury found that the contract[11] whose

---

[10] The parties also agree that Alabama law controls

[11] The original (September 15, 2000) Agreement.

performance is the basis of ProLiance's claim was both fraudulently induced and fraudulently performed, and as the Court has found that ProLiance actively and intentionally participated in keeping secret from Huntsville the amounts which ProLiance now claims are owed, ProLiance has failed to establish that those benefits were "voluntarily accepted" by Huntsville.

> [N]o claim can be founded upon an express contract which has not been fully performed, <u>nor will the mere fact that part performance has been beneficial be considered as sufficient to charge the party benefitted on a quantum meruit</u>, still, if the party who has a right to insist on the full performance of such a contract has <u>voluntarily accepted</u> the benefit of partial performance, the modern doctrine, <u>based upon principles of equity and right</u>, holds him liable to pay for the advantage he has thus <u>voluntarily accepted</u>.

*Hartsell v. Turner*, 71 So. 658 (1916), at 658 (emphasis supplied).

The facts as found by the Court bar such a recovery by ProLiance, even if the Court were to allow ProLiance its post-trial change of legal theories.

IV. <u>Even if ProLiance's Recovery under *Quantum Meruit* Were Not Equitably Barred, ProLiance Has Failed to Establish the Value of the Goods Delivered, and thus Its Claim in *Quantum Meruit* Fails.</u>

A party claiming in *quantum meruit* bears the burden of proof to establish the value of the benefit conferred upon the opposing party.

> To authorize a recovery on the quantum meruit, under the common counts it was incumbent on the plaintiff, not only to show services rendered at defendant's instance, but the reasonable value of such services....

15

> The plaintiff having failed to introduce any evidence tending to show the reasonable value of services which he alleges he rendered, an essential element to establish his right of recovery, the lower court was fully justified in giving the affirmative charge with hypothesis in favor of the defendant.

*Kelton v. Baker* 36 Ala.App. 268, *269-270, 54 So.2d 632,**633 (Ala.App.1951) (citations omitted).

ProLiance's assertion of the value of its claim in *quantum meruit* is based upon an analysis of the jury's verdict that totally ignores that the jury: (i) found for Huntsville and against ProLiance on the fraudulent inducement claim, and that Huntsville introduced evidence that, but for such fraudulent inducement, it would have fixed its price for gas much earlier, when prices were much lower; (ii) found for Huntsville and against ProLiance on the fraudulent performance claim, and that Huntsville introduced evidence that, but for such fraud, it would have fixed its price for gas much earlier, when prices were much lower; (iii) found for Huntsville and against ProLiance on the breach of fiduciary duty claim, and that Huntsville introduced evidence that, but for such breach, it would have fixed its price for gas much earlier, when prices were much lower; and (iv) found for Huntsville and against ProLiance on the intentional interference claim and that Huntsville introduced evidence that, because of such interference, Huntsville had to pay more for gas under the supply contract it ultimately entered into. The Court finds that ProLiance's

calculation of the value that "must," under that jury verdict, be attributed to the gas delivered to Huntsville in December, 2000, and January, 2001, is not supported by the evidence, and is legally flawed as well.

Additionally, ProLiance cannot rest on the contract price[12]. "[A party] may ... render himself liable on a quantum meruit, less such damages as he may [have] sustain[ed] from the [other party's] breach, <u>but not for the contract price, unless so agreed, after breach</u>...." *R. D. Burnett Cigar Co. v. Art Wall Paper Co.*, 51 So. 263, 268 (1909). The Court finds that that Huntsville never agreed to the contract price after the breach.

For all of the reasons stated above, the Court finds for Huntsville and against ProLiance as to Count Four. A separate Order will issue entering judgment in faovr of Hunstville and against ProLiance on Count Four of the Counterclaim.

DONE April 21, 2005.

*[signature]*
**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

[12] And the jury necessarily found, when it found in Huntsville's favor on ProLiance's Count One claim for breach of contract, that Huntsville was not liable to ProLiance for any sums on account.